# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS<br>P.O. Box 845<br>Rosamond, CA 93560;<br><br>MISSOURI COALITION FOR THE ENVIRONMENT FOUNDATION<br>725 Kingsland Ave., Ste. 100<br>St. Louis, MO 63130;<br><br>NATURAL RESOURCES DEFENSE COUNCIL<br>40 West 20th St., 11th Floor<br>New York, NY 10011; *and*<br><br>SIERRA CLUB<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>MICHAEL S. REGAN, Administrator,<br>U.S. Environmental Protection Agency, in his official capacity,<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br><br>       *Defendant*. | Civil Action No. 1:22-cv-3005<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. This is a suit to compel the Administrator of the U.S. Environmental Protection Agency ("EPA") to take actions required by the Clean Air Act ("Act") to protect the public from lead, arsenic, and other hazardous air pollutants emitted by industrial lead smelters. *See* 42 U.S.C. §§ 7401-7671. The Act requires that EPA limit emissions of cancer-causing and other toxic chemicals by promulgating National Emission Standards for Hazardous Air Pollutants

("NESHAP" or "air toxics standards"). *Id* § 7412(d). EPA must "review, and revise as necessary" these standards "no less often than every 8 years." *Id.* § 7412(d)(6). EPA must also review health risks and promulgate additional standards to provide an ample margin of safety to protect public health within eight years of promulgating section 112(d) standards. *Id.* § 7412(f)(2).

2.      EPA first issued air toxics standards for secondary lead smelters (also known as battery recyclers) in June 1995. EPA, Final Rule, 60 Fed. Reg. 32,587 (June 23, 1995); 40 C.F.R. Part 63, Subpart X. Despite EPA's duty to review and revise the section 112(d) standards no less often than every eight years, and to promulgate additional standards to provide an ample margin of safety to protect public health and the environment under section 112(f)(2), EPA did not issue another rule until 2012—and only after a legal challenge by the Sierra Club. EPA, Final Rule, National Emissions Standards for Hazardous Air Pollutants from Secondary Lead Smelting, 77 Fed. Reg. 556 (Jan. 5, 2012) ("2012 Rule").

3.      More than eight years have passed since EPA last reviewed and revised the secondary lead smelting standards. *Id.*

4.      Since that time, EPA is and has been in ongoing violation of the Act. 42 U.S.C. § 7412(d)(6).

5.      EPA's failure to review and revise the air toxics standards has caused, and is continuing to cause, irreparable harm to Plaintiffs' members and other members of the public who live near secondary lead smelters. EPA's violation of the Act has left emission standards in place for more than nine years without review or revision, exposing Plaintiffs' members to hazardous air pollution from insufficiently regulated lead smelters.

6.      To remedy EPA's failure to comply with its statutory obligation, Plaintiffs seek

declaratory and injunctive relief compelling EPA to review and, as necessary, revise the air

toxics standards for the secondary lead smelter source category as expeditiously as possible.

## JURISDICTION, VENUE, AND NOTICE

7.      This action arises under the Clean Air Act. 42 U.S.C. § 7412(d)(6).

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1361 and 42 U.S.C. § 7604(a)(2).

9.      This Court may grant the requested relief pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1361, and 42 U.S.C. § 7604(a)(2).

10.     Plaintiffs have a right to bring this action under the Clean Air Act, 42 U.S.C.

§ 7604(a)(2), 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

11.     Venue is vested in this Court under 28 U.S.C. § 1391(e) because the Defendant,

EPA Administrator Michael S. Regan, resides in this district.

12.     By certified mail postmarked June 7, 2022, Plaintiffs gave notice of this action to

the Administrator as required under 42 U.S.C. § 7604(b)(2) and 40 C.F.R. §§ 54.1-54.3.

13.     As more than sixty days have passed since this submission, Plaintiffs have

satisfied these notice requirements.

## PARTIES

14.     Plaintiff California Communities Against Toxics ("CCAT") is a nonprofit

organization headquartered in Rosamond, California. CCAT is an environmental justice network

of members and member groups that works for environmental justice and protection from toxic

air pollution in California and nationally. Through public education, advocacy, and community

organizing, CCAT aims to reduce its members', constituents', and other local community members' exposure to pollution; to expand knowledge about the effects of toxic chemicals on human health and the environment; and to protect the most vulnerable people from harm.

15.     Plaintiff Missouri Coalition for the Environment Foundation ("MCE") is a nonprofit organization headquartered in St. Louis, Missouri. Founded in 1969, MCE works to ensure clean water, clean air, clean energy, and a healthy environment, and serves its members through information, education, public engagement, and legal action.

16.     Plaintiff Natural Resources Defense Council ("NRDC") is a national nonprofit environmental and public health organization incorporated under the laws of the State of New York. NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. With over 325,000 members nationwide, NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC furthers its mission in part by advocating for stronger emission pollution standards. The organization also uses the information it obtains in the rulemaking process to educate its members and the public about the environmental and human health consequences of air pollutants, including those emitted by secondary lead smelters.

17.     Plaintiff Sierra Club is a national nonprofit organization headquartered in Oakland, California, with 67 chapters and over 800,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club is committed to protecting clean air and public health

through reducing pollution from and providing its members and the public with information about industrial sources, including secondary lead smelters.

18.     Defendant Michael S. Regan is the Administrator of the EPA. In that role, he is charged with the duty to uphold the Clean Air Act and to take required regulatory actions according to the schedules established therein. *See* 42 U.S.C. § 7601.

## LEGAL FRAMEWORK

19.     The Clean Air Act is designed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). A "primary goal" of the Clean Air Act is "pollution prevention." *Id.* § 7401(c).

20.     The Act requires EPA to impose emission standards on various kinds of pollution, including hazardous air pollutants. Hazardous air pollutants especially harm public health and the environment by, for example, heightening the threat of cancer and other serious illness in nearby communities. *Id.* § 7412; 40 C.F.R. Part 63.

21.     The 1990 Clean Air Act Amendments introduced the current framework under which hazardous air pollutants are regulated. With the 1990 Amendments, Congress created an initial list of hazardous air pollutants subject to regulation under the Act, including chemicals that are carcinogenic, neurotoxic, or cause other kinds of serious harm to human health. 42 U.S.C. § 7412(b)(1). The statute also provides that EPA must add chemicals to this list "upon a showing . . . that the substance is an air pollutant" which is "known to cause or may be reasonably anticipated to cause adverse effects to human health or adverse environmental effects." *Id.* § 7412(b)(3)(B).

22.     The Act requires EPA to create a list of categories of major sources of hazardous air pollutants and to promulgate emission standards for each of these major source categories. *Id.* § 7412(c)(1), (d). Major source emission standards—often referred to as "maximum achievable control technology" or "MACT" standards—require "the maximum degree of reduction in emissions of . . . hazardous air pollutants . . . [that] is achievable . . . ." *Id.* § 7412(d)(2). This maximum achievable reduction may not be less stringent than what the best controlled source or sources have "achieved." *Id.* § 7412(d)(3).

23.     After promulgating emission standards for hazardous air pollutants under section 112, the Act requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), [those] emission standards . . .  no less often than every 8 years." *Id.* § 7412(d)(6).

24.     In addition to strengthening preexisting emission standards for a given source category, EPA's duty during the review and revision process includes making all other changes "necessary" to comply with the Act, such as "add[ing] limits . . . for any air toxics the source emits that the existing standard does not address." *Louisiana Envtl. Action Network v. EPA*, 955 F.3d 1088, 1095 (D.C. Cir. 2020) ("*LEAN*").

25.     Section 112(f) of the Act requires further action "to protect health and [the] environment." 42 U.S.C. § 7412(f). Within eight years of promulgating emission standards under section 112(d), EPA must review the health and environmental risks and promulgate either residual risk standards "to provide an ample margin of safety to protect public health . . . or to prevent . . . an adverse environmental effect," or a determination that such standards are not required. *Id.* § 7412(f)(2)(A), (C).

6

26.     Standards that EPA promulgates under section 112(d) and (f) of the Act become effective "upon promulgation." *Id.* § 7412(d)(10), (f)(3).

27.     When promulgating new or revised standards, EPA must follow the Act's rulemaking procedures, including public notice-and-comment. *See id.* § 7607(d)(1)(C); *id.* § 7607(d)(2)-(9); *id.* § 7607(h).

## FACTS

### Failure to Review and Revise the Secondary Lead Smelting NESHAP

28.     In 1992, EPA published an initial list of source categories of hazardous air pollutants for which it would establish emission standards. Secondary lead smelters were among those source categories. Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 31,576 (July 16, 1992).

29.     In 1995, EPA promulgated National Emission Standards for Hazardous Air Pollutants for new and existing secondary lead smelters pursuant to section 112 of the Act. National Emission Standards for Hazardous Air Pollutants from Secondary Lead Smelting, 60 Fed. Reg. 32,587 (June 23, 1995); 40 C.F.R. Part 63, Subpart X. In response to comments received in petitions to reconsider these standards, EPA issued revised emission standards for secondary lead smelters in 1997. National Emission Standards for Hazardous Air Pollutants from Secondary Lead Smelting, 62 Fed. Reg. 32,209 (June 13, 1997).

30.     On January 5, 2012, EPA finalized a review of the secondary lead smelting standards under section 112(d)(6), as well as a health and environmental risk review rulemaking under section 112(f)(2). 2012 Rule, 77 Fed. Reg. 556 (Jan. 5, 2012).

31.     The Act requires EPA to "review, and revise as necessary" the secondary lead smelting standards at least every eight years. 42 U.S.C. § 7412(d)(6).

32.     As a result of the 2012 Rule, the Administrator was required to "review, and revise as necessary" the secondary lead smelting standards under section 112(d)(6) within eight years—that is, no later than January 5, 2020. *Id.*

33.     The Administrator has not conducted a rule review or promulgated revisions or a determination under section 112(d)(6) for secondary lead smelting since January 5, 2012.

34.     More than eight years have passed since EPA last reviewed and revised its section 112 standards for secondary lead smelting.

35.     EPA continues to fail to complete the action required by section 112(d)(6) and is in ongoing violation of the Act.

## Petition for Reconsideration of the 2012 Rule

36.     On March 5, 2012, Plaintiffs filed a petition for reconsideration of certain aspects of the 2012 Rule.

37.     The petition urged EPA to rectify serious flaws in the 2012 Rule, such as EPA's failure to provide an "ample margin of safety to protect public health." *Id*. § 7412(f)(2).

38.     In December 2012, EPA granted Plaintiffs' petition for reconsideration on at least the following issue: "Petitioners' allegation that the 'ample margin of safety' analysis performed for the final rule considered only cost, emission reductions and cost effectiveness, and did not include consideration of health and other metrics," stating "EPA will publish in the near future a Federal Register notice initiating a Notice and Comment rulemaking on the issue."

39.     Despite EPA's commitment to act in the "near future," EPA has not published the promised notice to initiate rulemaking on these issues, nor completed the reconsideration rulemaking.

40.     More than nine years have passed since EPA granted Plaintiffs' petition for reconsideration.

41.     EPA has yet to complete action on reconsideration.

42.     In 2012 and 2014, Plaintiffs submitted supplemental reconsideration petitions, presenting new health risk and monitoring data that further highlighted the health risk posed by secondary lead smelters and that underscored the need for EPA to take immediate action to protect public health. The 2014 supplemental filing also outlined lead smelting emission standards promulgated by California's South Coast Air Quality Management District that require emission reductions beyond those required by the 2012 Rule, emphasizing EPA's need to reconsider the 2012 Rule to strengthen EPA's lead smelter emission standards.

43.     While EPA has failed to complete its reconsideration of the 2012 Rule's section 112(f) review, scientific evidence has continued to accumulate proving significant and often irreversible harm to human health, especially to children's health, from lead exposure.

**Health Effects of Secondary Lead Smelting Pollution**

44.     Secondary lead smelters extract and process lead from scrap material and old batteries.

45.     Secondary lead smelters emit and expose local communities to lead, cadmium, arsenic, and other toxic air pollutants.

46.     Many of these facilities operate near people's homes and neighborhoods.

47.     Secondary lead smelters expose nearby communities to hazardous air pollutants that have no safe level of exposure.

48.     Lead is dangerous to humans at any level of exposure.

49.     Even a small blood-lead level increase can cause harm.

50.	Exposure to lead can cause irreversible neurological damage in children.

51.	Lead bioaccumulates in bone tissue and is released into the bloodstream, wreaking havoc on the body, affecting the gastrointestinal, neurological, cardiovascular, renal, endocrine, and reproductive systems.

52.	While lead exposure carries significant health risks no matter the exposure pathway, lead in air is particularly pernicious because the body absorbs higher levels of lead when it is inhaled.

53.	According to the National Cancer Institute, cadmium is highly toxic, and exposure is known to cause cancer of the lungs, prostate, kidney, pancreas, breast, and urinary bladder.

54.	The EPA classifies inorganic arsenic as a human carcinogen. Arsenic exposure is associated with an increased risk of cancer of the bladder, skin, lungs, digestive tract, liver, kidney, and lymphatic and hematopoietic systems. Chronic inhalation can also lead to skin conditions including chronic dermatitis, conjunctivitis, and pharyngitis.

55.	Carcinogens have no safe level of human exposure.

56.	Lead, cadmium, and arsenic also persist in the human body and in the environment and can cause harm from both inhalation and other pathways of exposure.

57.	Hazardous air pollutants are known to be particularly harmful to children, pregnant women, and the developing fetus due to a combination of increased vulnerability and exposure.

**ALLEGATIONS OF INJURY**

58.     EPA's failure to review, and, as necessary, revise secondary lead smelting

standards, as section 112(d)(6) of the Act requires, harms and will continue to harm Plaintiffs

and their members and constituents.

59.     Secondary lead smelters emit hazardous air pollutants that are known to cause

cancer and respiratory, neurological, developmental, and reproductive harm.

60.     Plaintiffs' members and constituents live, work, recreate, and engage in a variety

of other activities near secondary lead smelters. Plaintiffs' members have no choice but to

breathe the hazardous air pollutants emitted by secondary lead smelters.

61.     Plaintiffs' members are concerned about the presence of hazardous air pollutants

in the communities where they live, work, recreate, and engage in other activities. As a result of

these reasonable concerns about harms stemming from exposure to toxic air pollutants,

Plaintiffs' members' enjoyment of recreational, aesthetic, and other activities is significantly

diminished. Plaintiffs' members therefore experience harm to their recreational and aesthetic

interests.

62.     Further, secondary lead smelters emit air pollutants that can harm surrounding

wildlife, plants, waters, land, communities, and ecosystems.

63.     Lead emissions can result in decreased growth and reproduction in plants and

animals, and neurological effects in vertebrates.

64.     The harms caused to surrounding ecosystems by emissions from secondary lead

smelters also impair Plaintiffs' members' recreational and aesthetic interests.

65.     The Administrator's failure to take the action for secondary lead smelters required

by section 112(d)(6) deprives Plaintiffs' members of the rulemaking and cleaner air that would

result from such action. EPA's inaction prolongs and increases Plaintiffs' members' exposure to

higher levels of hazardous air pollutants that harm Plaintiffs' members' health, recreational, and

aesthetic interests, as described above. Performing the overdue rulemaking and assuring

emission reductions required under section 112(d)(6) would avoid and reduce these exposures,

and the resulting health, recreational, aesthetic, and other harms suffered by Plaintiffs' members.

66.     In performing the overdue rulemaking, the Administrator would be required to

remove the affirmative defense to civil penalties for exceedance of emission limits during

malfunction events currently in 40 C.F.R. § 63.552, which the D.C. Circuit held to be illegal. *See*

*Natural Res. Def. Council v. EPA*, 749 F.3d 1055, 1062-63 (D.C. Cir. 2014). The removal of this

unlawful defense to civil penalties would strengthen the incentive for secondary lead smelters to

comply fully and consistently with applicable standards.

67.     In its overdue rulemaking, EPA would also have to "tak[e] into account

developments in practices, processes, and control technologies," 42 U.S.C. § 7412(d)(6), such as

fenceline monitoring and corrective action for fugitive air emissions of hazardous air pollutants,

as well as other developments in pollution controls.

68.     EPA would also have to comply with the D.C. Circuit's decision in *LEAN* to

review the standards and address any uncontrolled emissions. *LEAN*, 955 F.3d at 1095.

69.     The Administrator's failure to take the action for secondary lead smelters required

by section 112(d)(6) also deprives Plaintiffs and their members and constituents of the

opportunity to present written comments, data, documentary information, views, and arguments

to EPA and have them considered by the agency and responded to as part of the overdue section

112(d)(6) rulemaking. The Administrator's failure to conduct the overdue rulemaking has thus

denied Plaintiffs and their members and constituents the opportunity to seek greater health

protections and emissions reductions and to have EPA consider and respond to such comments in taking the final action required by section 112(d)(6). This deprivation of the opportunity to present comments and arguments and have them considered and addressed by EPA impairs Plaintiffs' and their members' and constituents' ability to serve and protect their interests and fulfill their organizational missions.

70.     The Administrator's failure to take the action for secondary lead smelters required by section 112(d)(6) also deprives Plaintiffs and their members and constituents of information, including determinations from the Administrator pursuant to section 112(d)(6) and underlying evidence related to such determinations. Such information includes: the emission limitations existing sources have achieved; the current pollution control methods, practices, and technologies that could be or are being used to achieve emission reductions; the emissions that remain under the existing standards; and other information EPA would consider and make public during the overdue rulemaking that is relevant to the review and need for stronger emission standards. Plaintiffs and their members are entitled to such information by law. *See, e.g.*, 42 U.S.C. § 7607(d)(3)-(6) (describing documents that must be made "open to public inspection" as part of section 112 rulemakings).

71.     Plaintiffs need this information to advance their organizational purposes, including educating their members and constituents, and working to assure stronger health and environmental protections. Plaintiffs' members and constituents need this information to better understand the operations of and dangers posed by secondary lead smelting facilities near their homes, to take self-protective measures to minimize their exposure to pollutants emitted by secondary lead smelters, and to work for stronger health and environmental protections.

72.     For all of the foregoing reasons, the failures complained of herein cause Plaintiffs

and their members and constituents injuries for which they have no adequate remedy at law.

Granting the requested relief and ordering the overdue rulemaking would redress these injuries.

### CLAIM FOR RELIEF

73.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth

fully herein.

### Violation of Section 112(d)(6) of the Clean Air Act

74.     The Administrator's failure to review and revise as necessary the National

Emission Standards for Hazardous Air Pollutants for the secondary lead smelting source

category in 40 C.F.R. Part 63, Subpart X, as required by section 112(d)(6) of the Act, constitutes

a "failure of the Administrator to perform any act or duty under this chapter which is not

discretionary" within the meaning of section 304(a)(2) of the Clean Air Act, 42 U.S.C.

§ 7604(a)(2).

75.     Each day the Administrator fails to take these legally required actions, Defendant

commits new, additional, and ongoing violations of his (EPA's) duties under section 112(d)(6).

### PRAYER FOR RELIEF

Plaintiffs respectfully ask that the Court:

(1)     Declare that EPA's failure to timely review the National Emission Standards for

Hazardous Air Pollutants for secondary lead smelters, 40 C.F.R. Part 63, Subpart X, and either to

revise those standards as necessary or issue a final determination that such revision is not

necessary, as required by section 112(d)(6) of the Act, constitutes a "failure of the Administrator

to perform any act or duty under this chapter which is not discretionary with the Administrator"

within the meaning of section 304(a)(2) of the Act;

(2)     Order the Defendant Administrator to review the National Emission Standards for

Hazardous Air Pollutants for secondary lead smelters, 40 C.F.R. Part 63, Subpart X, and either to

revise them as necessary or to issue a determination that revision is not necessary, in accordance

with section 112(d)(6) of the Act and pursuant to an expeditious deadline set by this Court;

(3)     Retain jurisdiction to ensure compliance with this Court's decree;

(4)     Award Plaintiffs the costs of this action, including reasonable attorney fees; and

(5)     Grant such other relief as the Court deems just and proper.


DATED: October 5, 2022                    Respectfully submitted,


                                          /s/ Emma Cheuse
                                          Emma Cheuse (D.C. Bar No. 488201)
                                          Neil Gormley (D.C. Bar No. 1008462)
                                          Deena Tumeh (D.C. Bar No. 1741543)
                                          EARTHJUSTICE
                                          1001 G Street NW, Suite 1000
                                          Washington, D.C. 20001
                                          (202) 667-4500
                                          echeuse@earthjustice.org
                                          ngormley@earthjustice.org
                                          dtumeh@earthjustice.org

                                          *Counsel for Plaintiffs California Communities
                                          Against Toxics, Missouri Coalition for the
                                          Environment Foundation, Natural Resources
                                          Defense Council, and Sierra Club*